UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
---------------------------------------------------
In re

    JON J. PETERSON, INC.,                         08-15082 B
     d/b/a HOLIDAY HARBOR,
     d/b/a HOLIDAY HARBOR MARINA,

                  Debtor                      <u>DECISION & ORDER</u>
---------------------------------------------------

                Damon Morey LLP
                Daniel F. Brown, Esq., of counsel
                Beth Ann Bivona, Esq., of counsel
                The Avant Building, Suite 1200
                200 Delaware Avenue
                Buffalo, New York 14202-2150
                Attorneys for the Debtor

                Paul V. Webb, Jr., Esq.
                414 E. Fairmount Ave.
                PO Box 414
                Lakewood, New York 14750-0414
                Attorney for The Boatworks, LLC

                Harris Beach PLLC
                Kimberly Colaiacovo, Esq., of counsel
                727 Exchange Street, Suite 1000
                Buffalo, New York 14210
                Attorneys for Potential Offerors

                Menter, Rudin & Trivelpiece, P.C.
                Kevin M. N ewman, Esq., of counsel
                James C. Thoman, Esq., of counsel
                308 Maltbie St., Suite 200
                Syracuse, New York 13204
                Attorneys for Community Bank, N.A.

                Joseph W. Allen
                Assistant U. S. Trustee
                42 Delaware Avenue, Suite 100
                Buffalo, New York 14202

Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.

      Pursuant to section 363 of the Bankruptcy Code, the debtor in this Chapter 11 case seeks authority to sell substantially all of its assets outside the ordinary course of business. The present

dispute involves issues of fairness in the terms and conditions of an auction sale, as well as the setting of an appropriate "breakup" fee.

Jon J. Peterson, Inc., is the owner and operator of a marina located on the shores of Lake Chautauqua in the town of Celeron, New York. Its business includes the sale, restoration, storage and servicing of boats. On November 14, 2008, the corporation filed a petition for relief under Chapter 11 of the Bankruptcy Code. Asserting that the interests of creditors might best be served through a liquidation of assets, the debtor obtained an order dated April 23, 2009, which authorized the appointment of a real estate broker. After showing the property to several prospects, the broker identified The Boatworks, LLC ("Boatworks"), as a potential purchaser for virtually all of the debtor's assets. Consequently, on June 30, 2009, Boatworks and the debtor signed a purchase agreement (the "Asset Purchase Agreement"). Ostensibly, the debtor now presents Boatworks as a "stalking horse," whose offer will serve as a model for sale to any potential buyer.

The debtor's bankruptcy schedules indicate ownership of real property having an estimated value of $1,800,000, and of personal property with an estimated value of $699,217.61. The schedules further acknowledge that these assets are subject to liens that secure obligations in excess of $3.4 million. Indeed, no one has disputed the debtor's contention that its assets are more than fully encumbered, and that a distribution to unsecured creditors is therefore unlikely. In this context, the debtor has signed the Asset Purchase Agreement that contemplates a sale of all assets for $1,300,000. Although this sum is less than the scheduled values, the debtor asserts that the Asset Purchase Agreement represents the best offer received to date, and that the secured creditors have indicated their consent to a sale for this or any greater consideration.

By its terms and as required by 11 U.S.C. §363, the Asset Purchase Agreement is subject to the approval of the Bankruptcy Court. Therefore, one week after the execution of that contract, the debtor filed a motion to approve the proposed sale to Boatworks. In a second motion, the debtor sought alternatively to establish bidding procedures in the event that other qualified purchasers might seek to present competing offers. Initially, a hearing on the request to establish bidding

procedures was scheduled for July 20, in advance of a hearing on July 30 to approve the ultimate sale. In the absence of any competing bidders, the debtor intended to press its motion to approve a sale to Boatworks. But if other bidders presented themselves, the debtor would be positioned to conduct an auction of its property.

At the hearing on July 20, counsel reported that the debtor and Boatworks had agreed to adjourn the hearing on the sale or auction from July 30 to August 31, but that the debtor otherwise requested that the court approve the proposed bidding procedures. These bidding procedures included the setting of a "breakup" fee that would be payable to Boatworks in the event that someone other than Boatworks would ultimately make the highest bid. Counsel for two other potential bidders objected to the proposed terms and procedures of sale. With regard to the breakup fee, the court ruled that the debtor had failed to provide sufficient justification, but that Boatworks would be allowed to prove the reasonableness of its proposed fee at a hearing to be held on August 10. The court further made a preliminary ruling on the reasonableness of the various other terms of sale, and directed the parties to prepare an appropriate order consistent with the court's oral direction. Unfortunately, the parties were unable to agree on whether competing bids would be subject to contingencies in the Asset Purchase Agreement. Thus, the hearing on August 10 served as the opportunity to consider this further issue, as well as the reasonableness of the breakup fee.

Standing

Initially, the debtor asserts that prospective bidders have no standing to object to the terms and conditions of an auction sale. This argument might have relevance to circumstances where some type of formal objection is a prerequisite for judicial consideration of a dispute. To the contrary, with or without objection by a party with standing, a debtor in possession may sell assets outside the ordinary course of business only "after notice and a hearing." 11 U.S.C. §363(b). Thus, the court must approve the terms and conditions of the bidding process. Any argumentation merely facilitates the statutory mandate for judicial review. As parties with interest, prospective bidders may be positioned to offer valuable insight and perspective. Though arguably not parties in interest, they are

welcomed to appear at least as friends of the court. In any event, the present decision is a necessary fulfilment of the court's duty to consider the reasonableness of the terms and conditions of any proposed sale of estate assets. Even without objection from other potential bidders, the bidding procedures would still require a resolution of the same infirmities that are discussed herein.

### Sale Contingencies

As signed by the debtor and Boatworks, the Asset Purchase Agreement states that a closing is subject to four contingencies. In addition to bankruptcy court approval, these contingencies relate to financing, environmental issues, and the completion of a "due diligence" investigation. The Asset Purchase Agreement provides further that Boatworks may cancel the contract if it is unable to satisfy any of these three non-bankruptcy contingencies within 45 days after its execution of the agreement on June 30. At the hearing on August 10, counsel reported that Boatworks intended to waive these contingencies. Consequently, in drafting an order setting the terms and procedures for bidding, the debtor proposed that any auction sale be without any contingency other than Bankruptcy Court approval. To this suggestion, the other prospective bidders now object. They contend that any auction participants should be offered the same terms, including contingencies, that the debtor had allowed to Boatworks in the Asset Purchase Agreement.

As a general rule, debtors in Chapter 11 will liquidate assets pursuant to the terms of a confirmed plan of reorganization. Without a reorganization plan, debtors may sell assets outside the ordinary course of business only with court approval and upon demonstration of "a good business reason" to allow the sale. *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2nd Cir. 1983). In the present instance, the largest secured creditor has already obtained relief from the automatic stay of section 362 of the Bankruptcy Code. Facing the threat of foreclosure, the debtor contends that its proposed sale or auction represents the best opportunity to maximize a recovery of asset value and to minimize the size of any deficiency to secured creditors. Indeed, no one disputes that the debtor has exercised sound business judgment in proposing a sale outside the ordinary course. Rather, the only outstanding dispute involves the terms and conditions of the liquidation.

Outside the context of a Chapter 11 plan, the authority to sell assets derives from 11 U.S.C. §363. In relevant part, subdivision (b)(1) of this section states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." As a debtor in possession, Jon J. Peterson, Inc., now serves as a trustee pursuant to 11 U.S.C. §1107(a). To effect its proposed sale or auction, therefore, the debtor must secure the approval of this court after notice and a hearing. Although the Bankruptcy Code does not recite a standard of justification for a sale outside the ordinary course, I agree with the court in *Matter of Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987), that the debtor must demonstrate "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith."

The debtor's motion to approve bidding procedures was duly served upon all creditors and parties in interest. In paragraph 12 of that motion, the debtor's counsel makes the following statement: "[S]o as to ensure that any competing bids are made on terms which permit ready comparison and analysis of which bid is a higher and better offer, the Debtor also proposes that bidding procedures be adopted which provide that any competing bids be required to be made on the same material terms and conditions as are included in the [Asset Purchase Agreement], without modification, but for increased purchase price." Paragraph 5 of the Asset Purchase Agreement expressly recites contingencies for financing, environmental issues, and the exercise of due diligence. Thus, in making its motion, the debtor effectively told creditors that the auction procedures would allow parties to bid for a contract with these same contingencies.[1] The deletion of these contingencies from the bidding procedures would therefore change a material provision of what the debtor had noticed to creditors. Due process requires consistency with the notice to creditors, so that bidding procedures must allow a sale subject to satisfaction of the same contingencies during a similar period of 45 days from the execution of the winning bidder's contract.

---

[1] In any dispute between the debtor and Boatworks, cancellation provisions must relate to 45 days from June 30, the date on which the parties executed the contract. With respect to the rights of other parties, however, the notice has established terms and conditions that include contingencies with a 45 day cancellation period. To have any meaning whatsoever, this period must extend 45 days from any new contract resulting from the auction. *See Charter Asset Corp. v. Victory Markets, Inc. (In re Victory Markets, Inc.)*, 221 B.R. 298 (B.A.P. 2nd Cir. 1998).

Even if the debtor were to give a corrected notice to its creditors, notions of fairness and equity compel a bidding procedure in the present instance that incorporates contingencies for financing, environmental review, and the exercise of due diligence.  Here, the debtor negotiated the Asset Purchase Agreement to serve as a standard contract for the liquidation of assets.  When executed on June 30, the Asset Purchase Agreement gave to Boatworks the benefit of a contract with the protections of contingencies.  As originally noticed, the hearing to approve this contract was scheduled for July 30, a date that preceded the termination of cancellation rights under the contingency provisions.  Because Boatworks had not yet satisfied the contingencies, however, the parties agreed to adjourn the sale to August 31.  By that date, Boatworks will have enjoyed the full benefit of important cancellation rights.  To now remove contingencies from the bidding process is simply unfair.  Having rescheduled the auction to assure to Boatworks the full exercise of its contingency options, the debtor may not now adopt a procedure that will deny those same rights to every other bidder.

The purpose and goal of any asset sale is to maximize the recovery of value for the benefit of the bankruptcy estate.  In many instances, a "stalking horse" offer will facilitate a realization of that value, by establishing a framework for competitive bidding.  But unless the bidding process remains fair and equitable, competitors will refrain from the type of full participation that is needed to assure bids for the highest reasonable value.  For these reasons, the court will not approve bidding procedures that undermine principles of fair play.

Because secured claims will likely exceed the value of assets, the trustee may complete the present sale only with the consent of secured creditors.  *See* 11 U.S.C. §363(f).  For this reason, in a letter-brief filed after the last hearing on this matter, the debtor's counsel warns that secured creditors may refuse their consent for any auction with contingencies.  That, however, is of no consequence to the present decision.  Indeed, during the hearing on August 10, the Office of the United States Trustee expressed proper apprehension for the continuance of this case in Chapter 11.  To the extent that secured creditors desire the benefits of a sale in Chapter 11, they must accept bidding procedures that satisfy the mandate for fairness.  Accordingly, the court will require that any

auction allow for the same contingencies that the Asset Purchase agreement originally granted to Boatworks.

### Breakup Fee

As an inducement for Boatworks to incur the expense of making an initial "stalking horse" offer, the debtor agreed to propose that bidding procedures incorporate a breakup fee in the amount of $39,000. This court will approve breakup fees that serve the best interests of the estate and that are otherwise fair. Fairness compels that such fees provide no windfall, but that they instead represent a reimbursement for costs and expenses that the stalking horse reasonably incurred either in formulating its offer or in facilitating the bid process. Thus, the breakup fee may reimburse two types of expense: first, the cost of putting together a "stalking horse" bid; and second, expenses from which all bidders will benefit. In justifying the breakup fee, the debtor must necessarily assume the burden of proof. Otherwise, a disbursement of estate assets might occur without assurance of their proper and necessary use.

With its request to approve a breakup fee, the debtor offered no evidence of the expenses for which Boatworks sought reimbursement. For this reason, the court initially declined to allow the request, but granted leave to present appropriate proof at the further hearing on August 10. In advance of that hearing, the debtor provided a two-page affidavit by the president of Boatworks, in which he identifies the following seven expenses:

1. Attorney Fees ................................................. $ 3,500.00
2. Real Estate Appraisal (estimate) ...................... $ 2,500.00
3. Phase I Environmental Evaluation .....................$ 2,200.00
4. Consultant expenses related to loan
   application and due diligence review .................$25,000.00
5. Anticipated pre-closing attorney fees ................$ 2,500.00
6. Anticipated environmental study expenses..... .....$ 5,000.00
7. Anticipated pre-closing accounting fees ............  $ 1,000.00

The reasonableness of fees can only be evaluated within the context of the underlying offer. After it has made its offer, however, the "stalking horse" must assume the expenses that every other bidder must separately incur. Otherwise, by allowing the stalking horse to receive a benefit not

available to bidders generally, reimbursement would create a windfall that chills the bidding process. The present facts illustrate these distinctions.

In the preparation and negotiation of the Asset Purchase Agreement, Boatworks incurred legal expenses in the amount of $3,500. Similarly, it secured an appraisal of the property, at an estimated cost of $2,500. Both charges are properly reimbursed as part of a breakup fee, in that they represent reasonable outlays that Boatworks expended as part of its undertaking to present a stalking horse offer. In contrast, the other proposed reimbursements involve subsequent costs of consummating that offer. Being the type of expense that will be incurred by whomever becomes the successful purchaser, they fail to provide to the debtor any special and unique benefits that would justify their inclusion into a breakup fee.

By its language, the Boatworks offer included contingencies for financing, environmental review and due diligence. Essentially, therefore, the parties agreed that these contingencies and the costs of meeting them would relate not to the making of the offer, but to the ultimate closing of the transaction. Consequently, a proper breakup fee will exclude the above referenced charges for environmental reviews, consulting services related to financing and due diligence, and the legal and accounting expenses of closing. If the Asset Purchase Agreement contained no contingencies, then perhaps some of these expenses might properly have been viewed as a necessary condition for the "stalking horse" bid. By negotiating a right to cancel in the event that it could not satisfy the stated contingencies, however, Boatworks caused the related expenditures to become a cost of closing rather than a reimbursable expense of the stalking horse.

A breakup fee may also provide reimbursement of expenses that will benefit all prospective bidders. For example, the court would have allowed reimbursement for the cost of the Phase I Environmental Evaluation, if only Boatworks had agreed to share that report with all prospective bidders. At the hearing on August 10, however, the attorney for Boatworks advised that the evaluation was proprietary information that his client would not share. The environmental review

effectively became an expense incurred for the benefit of Boatworks alone, and is therefore not properly included into the allowed breakup fee.

Conclusion

For the reasons stated herein, the debtor's motion to approve bidding procedures will be denied unless the auction is subject to the same contingencies recited in the Asset Purchase Agreement, and unless the proposed breakup fee is limited to $6,000. To the extent that the debtor and Boatworks can accept these provisions, they may incorporate them into a revised order setting the terms and conditions of the bidding process.

So ordered.

Dated:  Buffalo, New York                              /s/     CARL L. BUCKI
        August 20, 2009                         Carl L. Bucki, Chief U.S.B.J., W.D.N.Y.